UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re | : | Chapter 7 |
| MURTY S. VEPURI and VARALXMI VEPURI | : | |
| Debtors | : | Bankruptcy No. 08-11730bf |

| | | |
|---|---|---|
| NATIONAL FERTILIZERS, LTD. | : | |
| Plaintiff | : | |
| v. | : | |
| MURTY S. VEPURI and VARALXMI VEPURI | : | |
| Defendant | : | Adversary No. 08-0156 |

................................................

MEMORANDUM

................................................

In the above-captioned adversary proceeding, plaintiff National Fertilizers, Ltd. (referred to by the parties as "NFL") asserts that the defendants' $2,000,000 federal district court judgment debt to it is nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A) and (a)(6).[1]  As will be discussed, NFL relies exclusively on the estoppel

---

[1]In its adversary complaint, NFL raised two counts.  Count I sought nondischargeability of its claim under 11 U.S.C. § 523(a)(2)(A), (a)(2)(B), (a)(4), and (a)(6).  At trial, however, it elected to proceed under only § 523(a)(2)(A) and (a)(6).  Count II sought denial of the debtors' discharge under § 727.

By order dated January 21, 2009, I conditionally granted the plaintiff's motion to voluntarily dismiss Count II of its complaint seeking denial of the debtors' discharge pursuant to 11 U.S.C. § 727(a).  I allowed any creditor or party in interest to substitute itself as plaintiff under Count II by filing and serving a motion by January 30, 2009.  See Fed. R. Bankr. P. 7041; In re Donovan, 2009 WL 595927, at *8 (Bankr. S.D. Fla. 2009) ("[C]ourts generally have permitted another party in interest to step into the shoes of the plaintiff moving to dismiss § 727
(continued...)

effect of the judgment rendered against Mr. and Mrs. Vepuri after a jury trial concluded

in the United States District Court for the District of New Jersey in May 2005.

      The Vepuris also presented no evidence at trial.  They too rely upon the

prepetition judgment rendered against them, and contend that the federal court jury failed

to make findings that would constitute the elements necessary to hold NFL's judgment

nondischargeable under section 523(a)(2)(A) or (a)(6).

      In addition, the Vepuris filed a motion under section 522(f) to avoid the

judicial lien held by NFL based upon the this prepetition judgment.  <u>See</u> <u>generally</u> <u>In re</u>

<u>Miller</u>, 299 F.3d 183 (3d Cir. 2002).  At the request of the parties, this avoidance motion

was heard at the same time as trial on NFL's nondischargeability complaint.  At trial, the

parties agreed that if NFL's claim is dischargeable, then the debtors are entitled to relief

under section 522(f).  If the claim is nondischargeable, however, then the debtors' section

522(f) motion is contested.

I.

      At trial, neither party called any witnesses.  Instead, six exhibits were

offered in evidence.  Exhibit P-1 is a copy of transcripts of the entire trial from May 4,

2005 to May 25, 2005 in the United States District Court for the District of New Jersey,

---

     [1](...continued)
claims.").  As no substitution request was made, this count was dismissed with prejudice.
     Accordingly, the only relief NFL sought at trial was nondischargeability under
section 523(a)(2)(A) and/or (a)(6).

2

consisting of volumes 1 through 13.[2]  Exhibit P-2 is a copy of the docket entries from that

case: 01-cv-05397.  Exhibit P-3 is a copy of NFL's second amended complaint filed in

the district court litigation.  Exhibit P-4 is a copy of the jury verdict, and exhibit P-5 is a

copy of the judgment from the district court litigation.  Finally, exhibit P-6 is a copy of

the debtors' bankruptcy Schedule C.  The parties also agreed that I should take judicial

notice under Fed. R. Evid. 201 of all of the debtors' bankruptcy schedules.

From these documents, the following material facts are established.

NFL commenced a civil action against the Vepuris in the United States

District Court for the District of New Jersey on November 11, 2001.  See ex. P-2.  In its

amended complaint, NFL described an elaborate plan wherein a Turkish corporation,

Karsan Danismanlik Turizm Sanayi Ticaret Ltd. Sti. ("Karsan"), sought to defraud NFL

by entering into a contract to supply urea fertilizer to NFL that Karsan never intended to

perform.  See ex. P-3.  Karsan was alleged to have disbursed the $38 million prepayment

made to it by NFL to international entities.  Id.

The Verpuris were sued because Karsan, through Mr. Sambasiva Rao, an

agent of Karsan, transferred $2 million of this $38 million to Malyn Holding Ltd., a

corporation controlled by the Vepuris  Id.  Malyn was a Bermuda company with a bank

account in New Jersey's Midlantic Bank.  Id.

At trial in federal court in New Jersey, Mr. Vepuri testified that on

November 30, 1995, Malyn received $2 million from Mr. Rao to invest on his behalf.  Ex.

P-1, Vol. 7, pp. 824-25.  Malyn invested these funds in securities.  Ex. P-1, Vol 7, pp.

---

[2]There are multiple copies of some of the volumes.

3

801-02.  The funds, however, were never placed by Mr. Verpuri in an account with Mr. Rao's name.  Ex, P-1, Vol 7, p. 849.

Mr. Vepuri later received a communication from Mr. S.K. Sharma, a representative of Karsan, who, Mr. Vepuri testified, told him that the $2 million belonged to Karsan, but would be owed to Mr. Rao as a commission and was to be invested by Mr. Rao.  Ex. P-1, Vol. 7, pp. 850-54.  Mr. Verpuri also denied knowing that these funds came from NFL.  Ex. P-1, Vol. 7, p. 854.

The jury also was informed that, during a trip to India in early June 1996, Mr. Vepuri learned that Mr. Rao was interrogated by the Indian investigating agency, "CBI," regarding NFL and fertilizer supply contracts.  Ex. P-1, Vol. 7, pp. 822-23.  Mr. Vepuri testified, however, that Mr. Rao informed him that Karsan had a contract dispute with NFL, and not that any attempt was made to defraud NFL.  Ex. P-1, Vol. 7, pp. 845-46.

The jury trial further revealed that on June 12, 1996, Mr. Vepuri's brother-in-law sent him a facsimile transmission from India that contained copies of newspaper articles about the investigation.  Ex. P-1, Vol. 7, pp. 840-41.  These articles referenced an Indian company called Amertek, also owned by the Vepuris, which had a contract to supply fertilizer to NFL, but failed to do so and so lost its billing bond.  Ex. P-1, Vol. 7, pp. 824, 844.  Mr. Rao was the chief executive of Amertek.  Id., at p. 819.

Also on June 12, 1996, Mr. Vepuri flew to Bermuda to inform Malyn's board of directors and attorney of the India investigation and that Malyn was in possession of $2 million transferred by Mr. Rao.  Ex. P-1, Vol. 7, pp. 825-29; Vol. 8, p. 882.  According to Mr. Vepuri, the board of directors, through its attorney, advised the

4

Attorney General of Bermuda of the money that was sent by Mr. Rao and of the newspaper articles; Mr. Vepuri then awaited further developments. Ex. P-1, Vol. 8, p. 885-86.

Mr. Vepuri explained to the jury that he did not inform the CBI of his receipt of funds from Mr. Rao because he was uncertain that their source was NFL, and did not know that Karsan was not entitled to these funds. Ex. P-1, Vol. 7, pp. 854-56. Nor did he tell the CBI about an August 29, 1996 letter he received instructing him to await a directive to transfer the $2 million to a post office box in India. Ex. P-1, Vol. 8, pp. 884-86, 875. (Such a directive was never given.)

On October 29, 1998, Mr. Vepuri disbursed $100,000 of the $2 million to two accounts payable to two individuals upon instruction of Mr. Sharma. Ex. P-1, Vol. 8, pp. 889-893. He did not inform the CBI of these transactions, either, he says because he did not really know whose money it was. Ex. P-1, Vol. 8, pp. 893-94. Mr. Vepuri testified that he lost the rest of the money invested on behalf of Mr. Rao. Ex. P-1, Vol. 9, p. 1105.

Despite having a controlling interest in Malyn, Mrs. Vepuri did not take part in the business, according to Mr. Vepuri. Ex. P-1, Vol. 7, p. 768. She focused on her medical career, on the Vepuri's children, and upon practicing her faith. Ex. P-1, Vol. 8, p. 869.

In its amended district court complaint, NFL asserted five counts against the Vepuris: fraud, conversion, unjust enrichment, "imposition of a constructive trust," and civil conspiracy. Ex. P-3. NFL demanded judgment, including compensatory damages, equal to the full amount of NFL's losses from the "urea scam," imposition of a

5

constructive trust, punitive damages, interest, costs of suit including reasonable attorneys'

fees, and such other relief the court deemed just and proper.  Id.

       During the trial, NFL withdrew its fraud claim, stating that the allegations it

had pled in connection with that count were substantially similar to its allegations made in

the conversion count, and that it was not alleging that the Vepuris made any

misrepresentations.  Ex. P-1, Vol. 4, pp. 511-12.  "[W]e're not really alleging that Mr.

Vepuri or Mrs. Vepuri made representations, what we're alleging is there was a fraud,

and they were civil conspirators in connection, in part, of that fraud in connection with

hiding the money.  And that's, essentially, the claim as opposed to they made

misrepresentations."  Id.[3]  Later in the trial, NFL's counsel explained to the trial judge:

"Our theory is Karsan defrauded NFL.  Mr. Vepuri's role in this was to hide the money.

And that's the civil conspiracy.  And he joined the conspiracy at some point after the

fraud had been committed."  Ex. P-1, Vol. 10, p. 1178.

       After the plaintiff's fraud count was withdrawn, there remained four counts

asserted against the Vepuris: conversion, unjust enrichment, constructive trust, and civil

conspiracy.  Ex. P-3.  In its closing arguments to the jury, however, NFL sought a verdict

only upon three claims:

---

[3]In addition, after NFL had rested its case, the Vepuris moved to dismiss NFL's
punitive damages request.  Ex. P-1, Vol. 8, p. 938.  NFL admitted that in its case in chief it
needed to have shown harm suffered by NFL as a result of Mr. Vepuri's acts or omissions, and
that his conduct was malicious or that he acted in a wanton and willful disregard of another's
rights.  Ex. P-1, Vol. 8, p. 941.  In granting the motion, the court stated that the evidence
presented did not meet New Jersey's punitive damages clear and convincing standard, "even
drawing inferences in favor of the plaintiff . . . that any acts or omissions attributed or ascribed to
Mr. Vepuri were actuated by actual malice on the one hand or wanton or willful disregard of
persons who might be harmed by those acts or omissions on the other."  Ex. P-1, Vol. 10, p.
1323.

> First, the Vepuris, acting through a corporation they
> controlled, committed something called conversion:
> Wrongfully interfering with NFL's right to possession of its
> money when NFL had a right to immediate possession of its
> money by withholding NFL's $2 million.
>
> \*\*\*
>
> NFL's second claim is for unjust enrichment, because NFL
> believes that the Vepuris were unjustly enriched by their
> receipt of NFL's $2 million.
>
> \*\*\*
>
> NFL's final claim for your consideration is one for civil
> conspiracy, because the evidence shows that the Vepuris
> joined the conspiracy in which NFL had been defrauded of its
> money and then acted for years to further that conspiracy by
> keeping the proceeds of the fraud hidden.

Ex. P-1, Vol. 12, p. 1455-56.  Therefore, the constructive trust claim was not presented to

the jury.

At the conclusion of the trial, the trial judge gave general and specific

instructions to the jury.  Ex. P-1, Vol. 13, pp. 1568-84.  Those specific instructions, as

relevant to this adversary proceeding, were as follows:

> Conversion is the unauthorized assumption and exercise of
> the right of ownership over goods or personal chattels
> belonging to another . . . to the alteration of their condition or
> the exclusion of an owner's rights.
>
> To establish a claim of conversion, a plaintiff must prove the
> following elements: Number one, that ther exists property;
> Number two,, that the plaintiff has the right to immediate
> possession of that property; and Number three, that the
> defendant has interfered wrongfully with the plaintiff's right
> to possession of the property. . . .
>
> [C]onversion is an intentional tort – tort's fancy word for a
> civil wrong as opposed to a criminal wrong, okay?
>
> So conversion is an intentional tort, which means that it is any
> injury that one party intentionally inflicts upon another.  Since
> conversion is intentional wrongdoing, the law provides that a
> plaintiff is not barred from recovery merely because of its
> own carelessness or negligence in the transaction or

7

circumstances leading up to the conversion.  Negligence, as used in this context, means less care than that which a reasonable person or company would exercise in their affairs under similar conditions, or like conditions.

. . . The elements of good faith, intent or negligence do not play a part in an action for damages in conversion.  It is not essential to conversion that the motive or intent with which the act was committed should be wrongful, willful or corrupt.  The question of good faith, and the additional questions or elements of motive, knowledge, ignorance, or care or negligence, are not involved in actions for conversion.  The state of a person's knowledge with respect to the rights of an owner is of no importance and cannot in any respect affect the case.

The general rule is that a person who exercises unauthorized acts of dominion over the property of another, in exclusion of another's rights or inconsistent [sic] is liable in conversion although the person acted in good faith and in ignorance of the rights or title of the owner.

Ex. P-1, Vol. 13, pp. 1569-71.

Unjust enrichment, which is Count Two of the complaint, unjust enrichment is a legal doctrine which seeks to prevent a person from enriching himself or herself unfairly at the expense of another.

In order to establish the defendants were unjustly enriched, the plaintiff has the burden of proving the following elements by a preponderance of the credible evidence:

Number one, that the defendants were enriched by receipt of a benefit; and

number two, that the defendants' retention of the benefit would be unjust.

As used in this context, the retention of a benefit is unjust where the retention of the benefit or enrichment would be unfair.

Under the law of unjust enrichment, benefit is liberally construed.  A person confers a benefit by giving another party possession or or an interest in property.  To confer a benefit

8

means to provide any form of benefit.  The receipt of money
qualifies as the receipt of a benefit.

Id., at p. 1571.

A civil conspiracy is a combination of two or more persons
acting in concert to commit an unlawful act or to commit a
lawful act by unlawful means.  Such an agreement may be
made orally or in writing or may be implied by the conduct of
the parties.

The principal elements of a civil conspiracy are, number one,
an agreement between two or more persons, number two, to
inflict a wrong against or injury upon another, number three,
an overt act that, number four, results in damage.  To establish
a civil conspiracy, it must be shown that there was a simple
plan, the essential nature and general scope of which was
known to each person who is to be held responsible for its
consequences. . . .

In order to prove the alleged civil conspiracy, plaintiff must
prove that one of the conspirators defrauded NFL.  To prove a
fraud, a plaintiff must show by clear and convincing evidence
that a person or conspirator made, one, a material
misrepresentation of of a present or past fact, number two,
with knowledge of its falsity, number three, with the intention
that the plaintiff would rely upon that material
misrepresentation of a past or present fact, and number four,
which resulted in reasonable reliance by the plaintiff. . . .

. . . A person need not be a member of a conspiracy from its
inception.  A person can become a member of an existing
conspiracy by cooperating to further the object of the
conspiracy.

Id., at pp. 1572-75.

On May 26, 2005, the jury found both Vepuris liable for conversion and

unjust enrichment, and assessed damages on both counts in the amount of $2 million.  Ex.

P-4.  Furthermore, although the jury found that a fraud had been committed, and that a

9

civil conspiracy existed that defrauded NFL, the jury did not find that either of the
Vepuris were members of the conspiracy that defrauded NFL.  Id.[4]

On June 23, 2005, the New Jersey court entered a judgment on the jury
verdict against the Vepuris in the sum of $2 million, jointly and severally, plus interest
and costs of suit.  See ex. P-5 (undated); ex. P-2, entry #122 (providing date).  That
judgment was later transferred to Pennsylvania Court of Common Pleas of Bucks County
(and to the United States District Court for the Eastern District of Pennsylvania).  Motion
and Answer to Avoid Judicial Liens, ¶¶ 5-6.

Finally, in their amended bankruptcy schedules, the Vepuris claimed a
homestead exemption in the real property located at 1707 Scott Drive, Newtown,
Pennsylvania.  Ex.  P-6.  They valued the realty at $1,090,000, and asserted that six
mortgages and a lien for unpaid real estate taxes against the realty totaled $1,372,753.25.
See Amended Schedule A, C, and D.  Thus, on amended schedule C they valued their
homestead exemption at $0.  The parties agree that the entry of these transferred
judgments created judicial liens on the Newtown realty.[5]  See 42 Pa.C.S.A. § 4303(a); In
re Upset Sale, Tax Claim Bureau of Berks County, 505 Pa. 327 (1984).  Motion and
Answer to Avoid Judicial Liens, ¶ 7.

---

[4]Specifically, the Verdict Sheet asked: "Has Plaintiff NFL proven, by clear and
convincing evidence, that all of the elements of fraud have been met?"  Ex. P-4, at #6.  The jury
answered this question "yes."  Id.  Then the jury was asked "Has Plaintiff NFL proven, by a
preponderance of the credible evidence, that a civil conspiracy existed and that the conspiracy
defrauded NFL?"  Id., at #7.  The jury also answered this question "yes."  Id.  However, when
then asked "Has Plaintiff NFL proven, by a preponderance of the credible evidence, that Murty
Vepuri was a member of the conspiracy that defrauded NFL?" the jury answered "no," and
answered the same in reference to Mrs. Vepuri.  Id., at ##6, 7.

[5]NFL is not scheduled as a secured creditor on amended Schedule D.

II.

When a creditor seeks a determination that it holds a nondischargeable debt under 11 U.S.C. § 523(a), it bears the burden of demonstrating nondischargeability by a preponderance of the evidence.  See, e.g., Grogan v. Garner, 498 U.S. 279, 291 (1991); In re Graham, 973 F.2d 1089, 1101 (3d Cir. 1992).  Generally, the provisions of section 523(a) are "strictly construed against creditors and liberally construed in favor of debtors," owing to the overriding bankruptcy purpose of granting debtors a fresh start.  In re Cohn, 54 F.3d 1108, 1113 (3d Cir. 1995); see also Lugo v. Paulsen, 886 F.2d 602, 611 (3d Cir. 1989); In re Lee, 2000 WL 815928, at *2 (Bankr. E.D. Pa. 2000) In re Perkins, 2000 WL 1010580, at *3 (Bankr. E.D. Pa. 2000).

Collateral estoppel (a/k/a issue preclusion) applies to nondischargeability issues under section 523(c) (section 523(a)(2), (4), (6)) stemming from pre-bankruptcy state court litigation.  Grogan v. Garner, 498 U.S. 279, 284 n.1 (1991); see In re Graham, 973 F.2d 1089 (3d Cir. 1992); In re Schlessinger, 208 Fed. Appx. 131, 132 (3d Cir. 2006) (non-precedential).  The Third Circuit Court of Appeals explained the proper application of collateral estoppel in this context:

> Because the prior judgment was rendered by a federal court, we apply federal principles of collateral estoppel. . . .  For a party to be estopped from relitigating an issue, the following elements must be present: (1) the issue sought to be precluded must be the same as the one involved in the prior action; (2) the issue must have been actually litigated; (3) the issue must have been determined by a valid and final judgment; and (4) the determination must have been essential to the prior judgment. In re Ross, 602 F.2d 604, 608 (3d Cir. 1979); accord Restatement (Second) Judgments § 27 (1982).

In re Docteroff, 133 F.3d 210, 214 (3d Cir. 1997).

11

A.

To determine whether issue preclusion will mandate nondischargeability of NFL's claim under section 523(a)(6) in this proceeding, I must consider whether the federal court's jury verdict established all of the elements of willful and malicious conduct on the part of the Vepuris.

> Collateral estoppel is applicable if the facts established by the previous judgment in the Washington court that the progress payments were obtained by fraud, embezzlement, and willfully injurious conduct, meet the requirements of nondischargeability listed in 11 U.S.C. § 523(a)(2)(A), (a)(4), and (a)(6), namely that the money was obtained by fraud, embezzlement, or willful conduct. See In re Halpern, 810 F.2d 1061, 1064 (11th Cir.1987) (bankruptcy court makes ultimate determination regarding debt's dischargeability; collateral estoppel permits court to accept facts established by previous judgment as evidence of nondischargeability); In re Martin, 130 B.R. 930, 942 (Bankr. N.D. Ill.1991) (collateral estoppel may be invoked to foreclose relitigation of facts underlying dischargeability determination).

In re Docteroff, 133 F.3d at 215; see In re Schlessinger, 208 Fed. Appx. at 132; In re Langeslag, 366 B.R. 51, 59 (Bankr. D. Minn. 2007). Section 523(a)(6) provides:

> A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—
>
> (6) for willful and malicious injury by the debtor to another entity or the property of another entity.

The United States Supreme Court, in Kawaauhau v. Geiger, 523 U.S. 57 (1998), narrowly defined the phrase "willful and malicious" used in section 523(a)(6). The Court limited section 523(a)(6)'s scope to intentional torts:

> The word "willful" in (a)(6) modifies the word "injury," indicating that nondischargeability takes a deliberate or

12

> intentional *injury*, not merely a deliberate or intentional *act*
> that leads to injury.  Had Congress meant to exempt debts
> resulting from unintentionally inflicted injuries, it might have
> described instead "willful acts that cause injury."  Or,
> Congress might have selected an additional word or words,
> *i.e.*, "reckless" or "negligent," to modify "injury." . . .
> Moreover, as the Eighth Circuit observed, the (a)(6)
> formulation triggers in the lawyer's mind the category
> "intentional torts," as distinguished from negligent or reckless
> torts.  Intentional torts generally require that the actor intend
> "the *consequences* of an act," not simply "the act itself."
> Restatement (Second) of Torts § 8A, comment a, p. 15 (1964)
> (emphasis added).

Id. at 61-62; see also In re Markowitz, 190 F.3d 455, 464 (6th Cir. 1999).

Consistent with Geiger, the Third Circuit Court of Appeals had observed:

> [W]hen Congress required more than recklessness for
> nondischargeability, it required that the debtor have engaged
> in conduct more culpable than taking a deliberate action that
> had a high probability of producing harm. . . .  Rather, for the
> injury to have been "willed" by the debtor, it must at least
> have been substantially certain to result from the debtor's act.

In re Conte, 33 F.3d 303, 307 (3d Cir. 1994).  Accordingly, "[a]n injury is willful and

malicious under the Code only if the actor purposefully inflicted the injury or acted with

substantial certainty that injury would result."  Id., at 305.  "We hold that actions are

willful and malicious within the meaning of § 523(a)(6) if they either have a purpose of

producing injury or have a substantial certainty of producing injury."  Id. at 307; see, e.g.,

In re Giarratano, 2004 WL 2827138, at *3 (D. Del. 2004).

Although section 523(a)(6) requires that the debtor's prepetition conduct

fall within the scope of an intentional tort, not all intentional torts are considered willful

and malicious.  Davis v. Aetna Acceptance Co., 293 U.S. 328 (1934) (cited with approval

by Kawaauhau v. Geiger, 523 U.S. at 63-64); In re Schlessinger, 208 Fed. Appx. at 134

("Moreover, not all intentional torts are willful and malicious.") (citing <u>Davis</u>).  As

explained by one bankruptcy court,

> [t]he Supreme Court never categorically stated that all
> intentional torts were exempt from discharge under §
> 523(a)(6).  Rather, it did the contrary.  It emphasized that
> those intentional torts within the contemplation of (a)(6) were
> where the actor intends the consequences of his act, i.e.
> intentional injury, and not simply the act itself.

<u>In re Cantu</u>, 2008 WL 5459834, at *4 (Bankr. S.D. Tex. Nov. 26, 2008).

In addition, section 523(a)(6) requires a finding of both willful and

malicious injury.  <u>In re Barboza</u>, 545 F.3d 702, 706 (9th Cir. 2008); <u>In re Langeslag</u>, 366

B.R. at 57.  While <u>Geiger</u> explained the meaning of "willful injury," for the purpose of

section 523(a)(6), a malicious injury involves "(1) a wrongful act, (2) done intentionally,

(3) which necessarily causes injury, and (4) is done without just cause or excuse."  <u>In re</u>

<u>Barboza</u>, 545 F.3d at 706 (internal quotation omitted); <u>see</u> <u>In re Jacobs</u>, 381 B.R. 128, 136

(Bankr. E.D. Pa. 2008) (malice requirement refers to injuries that are wrongful and

without just cause or excuse, even in the absence of personal hatred, spite or ill-will); <u>In</u>

<u>re Lucotch</u>, 342 B.R. 469, 473 (Bankr. W.D. Pa. 2006) (same).

Indeed, one appellate court has concluded that section 523(a)(6) was

enacted by the Bankruptcy Reform Act of 1978 to overrule decisions that held conversion

debts nondischargeable in all instances:

> In fact, by adopting the requirement that the conversion be
> willful and malicious, Congress expressly overruled prior
> caselaw that had refused dischargeability when the conversion
> occurred innocently or recklessly.  <u>See</u> H.R. Rep. No. 595,
> 95th Cong., 1st Sess. 365 (1977), <u>reprinted in</u> 1978 U.S. Code
> Cong. & Ad. News 5787, 5963, 6320-21 ("reckless disregard"
> standard of <u>Tinker v. Colwell</u>, 193 U.S. 473, 24 S. Ct. 505, 48
> L. Ed. 754 (1902), and progeny, which refused
> dischargeability to conversions recklessly done, overruled);

14

see also 3 <u>Collier on Bankruptcy</u> ¶ 523.16[3] (L. King 15th
ed. 1984) (conversion without conscious intent to violate
rights of another or under mistake or misapprehension is
dischargeable even though debtor acted recklessly).

<u>In re Held</u>, 734 F.2d 628, 629-30 (11th Cir. 1984).

In this adversary proceeding, NFL relies heavily upon the jury finding the

Vepuris liable for conversion.  As explained in the instructions given by the trial court to

the jury, conversion is indeed an intentional tort.  <u>See</u> <u>generally</u> <u>LaPlace v. Briere</u>, 404

N.J. Super. 585, 595, 962 A.2d 1139, 1145 (App. Div. 2009).  Nonetheless, the Supreme

Court in <u>Geiger</u> observed, with reference to <u>Davis v. Aetna Acceptance Co.</u>, "that not

every tort judgment for conversion is exempt from discharge."

Indeed, the Court in <u>Davis</u> specifically addressed the application of that tort

to the former Bankruptcy Act's nondischargeability provision for willful and malicious

injuries to the person or property of another, stating: "[t]here is no doubt that an act of

conversion, if wilful and malicious, is an injury to property within the scope of this

exception. . . .  But a wilful and malicious injury does not follow as of course from every

act of conversion, without reference to the circumstances.  There may be a conversion

which is innocent or technical, an unauthorized assumption of dominion without

wilfulness or malice."  <u>Davis</u>, 293 U.S. at 332; <u>see</u> <u>In re Peklar</u>, 260 F.3d 1035, 1038 (9th

Cir. 2001) (under California law, a conversion is not always a willful and malicious injury

to the property of another); <u>see</u> <u>also</u> <u>Robertson v. Interstate Securities Co.</u>, 435 F.2d 784,

788 (8th Cir. 1971) (following <u>Davis</u>; conversion without showing of willfulness and

maliciousness is a dischargeable debt).

In considering the preclusive effect of the jury verdict against the Vepuris, I

note that the trial court judge carefully instructed the jury that, although conversion

qualified as an intentional tort, the element of intent to cause injury was not required.  To

this point, the district court judge explained:

> The elements of good faith, intent or negligence do not play a
> part in an action for damages in conversion.  It is not essential
> to conversion that the motive or intent with which the act was
> committed should be wrongful, willful or corrupt.  The
> question of good faith, and the additional questions or
> elements of motive, knowledge, ignorance, or care or
> negligence, are not involved in actions for conversion.  The
> state of a person's knowledge with respect to the rights of an
> owner is of no importance and cannot in any respect affect the
> case.

Ex. P-1, Vol. 13, p. 1570.[6]

Therefore, in entering its verdict against the Vepuris, the jury had to find

that their act in accepting and retaining NFL funds wrongfully obtained by Karsan or Mr.

Rao was intentional, but the jury did not have to find that these actions were malicious:

i.e., intended by the Vepuris to inflict injury upon NFL.  Indeed, the jury was not even

required to find that the Vepuris knew that the funds came from NFL and knew that these

funds were the product of a fraud.

Thus, despite liability for conversion constituting an intentional tort, the

district court conversion verdict against the Vepuris did not necessarily include all the

elements required to establish nondischargeability under section 523(a)(6).  See In re

Peklar, 260 F.3d at 1039:

> A judgment for conversion under California substantive law
> decides only that the defendant has engaged in the "wrongful

---

[6]Under New Jersey substantive law, "'[t]he elements of good faith, intent or
negligence do not play a part in an action for damages in conversion.'"  Barco Auto Leasing
Corp. v. Holt, 228 N.J. Super. 77, 83 (App. Div. 1988) (quoting McGlynn v. Schultz, 90 N.J.
Super. 505, 526 (Ch. Div. 1966), aff'd, 95 N.J. Super. 412 (App. Div. 1967), certif. den., 50 N.J.
409 (1967).

> exercise of dominion" over the personal property of the
> plaintiff. It does not necessarily decide that the defendant has
> caused "willful and malicious injury" within the meaning of §
> 523(a)(6). A judgment for conversion under California law
> therefore does not, without more, establish that a debt arising
> out of that judgment is non-dischargeable under § 523(a)(6).

See In re Burke, 354 B.R. 579, 583 (Bankr. D. Mass. 2006) ("[T]here is nothing in the

[state court] record before the Court to suggest that the Debtor's conversion of funds for

his own use was carried out with the actual intent to cause injury."). Since the jury

verdict did not establish the Vepuris' maliciousness in converting NFL's funds, the

plaintiff has not met its burden under section 523(a)(6). See In re Held,

734 F.2d at 630 ("Since the state court award of punitive damages did not necessarily

decide the question of willfullness and malice, principles of collateral estoppel did not

preclude the bankruptcy court from considering whether the conversion was willful and

intentional under § 523(a)(6) so as to deny dischargeability to the judgment."); Delawder

v. Mynes, 2007 WL 2116382, at *4 (S.D. W. Va. 2007):

> In Kawaauhau v. Geiger, 523 U.S. 57 (1998), the Supreme
> Court stated that § 523(a)(6) only applies to "acts done with
> the actual intent to cause injury" and "nondischargeability
> takes a deliberate or intentional *injury*, not merely a deliberate
> or intentional act that leads to injury." 523 U.S. at 61
> (emphasis original). Here, the jury instructions given in the
> state court proceeding did not require the jury to find
> Appellee's actions were willful and malicious in order to find
> conversion. Likewise, there is nothing on the verdict form
> which indicates the jury's decision establishes willful and
> malicious actions by Appellee.

See also In re West, 339 B.R. 557, 565 (Bankr. E.D.N.Y. 2006) (same). Compare

Garoutte v. Damax, Inc., 2009 WL 530905, at *4 (S.D. Ind. 2009) (state court judgment

of *criminal* conversion establishes the elements of section 523(a)(6)).

17

Since the only evidence offered by NFL in this proceeding on its claim under section 523(a)(6) was the district court verdict and judgment against the Vepuris, it has not met its evidentiary burden on that issue.

B.

The plaintiffs also argue that their claim against the debtors is nondischargeable under section 523(a)(2)(A) because all elements of fraud were proven by the plaintiff in the prior federal court litigation.  Section 523(a)(2)(A) states that:

> A discharge under section 727 . . . does not discharge an
> individual debtor from any debt—
>
> (2) for money, property services, or an extension, renewal or
> refinancing of credit, to the extent obtained, by—
>
> > (A) false pretenses, a false representation, or
> > actual fraud, other than a statement respecting
> > the debtor's or an insider's financial condition;

See generally Field v. Mans, 516 U.S. 59 (1995); In re Brady, 243 B.R. 253, 258 (E.D. Pa. 2000); In re Lee, 2000 WL 815928, at *2.

To successfully challenge the dischargeability of debt under section 523(a)(2)(A), the creditor must establish that: (1) the debtor made the representations knowing they were false; (2) the debtor made the representations with the intent and purpose of deceiving the plaintiff; (3) the creditor justifiably relied on the debtor's false representations; and (4) the creditor suffered a loss or damage as a proximate consequence of the representation having been made.  See Field v. Mans, 516 U.S. at 61 (1995); In re Ophaug, 827 F.2d 340, 342 n.1 (8th Cir. 1987); In re Maurer, 112 B.R. 710,

18

712-13 (Bankr. E.D. Pa. 1990); see also In re Hilley, 124 Fed. Appx. 81, 82 (3d Cir. 2005) ("Central to a § 523(a)(2)(A) claim is that there must be a misrepresentation.").[7]

As with its contention under section 523(a)(6), in this adversary proceeding NFL relies upon the prior jury verdict and district court judgment to establish the elements of nondischargeability section 523(a)(2)(A). For the following reasons, such collateral estoppel argument is unpersuasive.

As noted earlier, the jury did not find the Vepuris liable for fraud. Although the jury found that "all of the elements of fraud have been met" and that a civil conspiracy that defrauded NFL existed, the jury specifically found that the Vepuris were not members of that conspiracy to defraud. Furthermore, the plaintiff withdrew its fraud claim against the Vepuris in the district court litigation, acknowledging that the Vepuris made no representations to NFL that could be deemed fraudulent.

In other words, NFL proved to the jury that it had been the victim of a fraud, and that fraud also involved a civil conspiracy. But NFL did not prove to the jury that the Vepuris were participants in that civil conspiracy. Thus, the fraud was committed by others, and the Verpuris were found liable for unjust enrichment and, as discussed earlier, conversion of NFL property. Therefore, in holding the Verpuris liable for $2 million, the district court did not find the elements necessary for relief under section 523(a)(2)(A).

---

[7]In general, this test applies for all three grounds listed in section 523(a)(2)(A), even though the elements for each vary slightly. Thus, for example, a showing of justifiable reliance and causation of loss must be made in order to recover under any component of section 523(a)(2)(A). See In re Ali, 321 B.R. 685, 690 (Bankr. W.D. Pa. 2005).

Moreover, even if one were to construe the jury instructions and verdict to be unclear on the issue of whether the Vepuris committed fraud, since the jury did conclude that a fraud was indeed committed, such ambiguity would still weigh in favor of the defendants here, as it was NFL's burden to prove nondischargeability by a preponderance of the evidence.  See In re West, 339 B.R. at 565 (where the bankruptcy court is unable to determine whether the jury "actually decided" a required element for nondischargeability, court concluded that plaintiffs failed to meet their burden).

In addition, the jury verdict holding the Vepuris liable for conversion does not fall within the scope of section 523(a)(2)(A).  The tort of conversion is "separate and distinct from fraud, fraud in fiduciary capacity, embezzlement, and larceny."  In re Wiles, 145 B.R. 346, 350 (Bankr. M.D. Fla. 1992).  Thus conversion liability alone could not serve to demonstrate dischargeability under section 523(a)(2)(A).


III.


Accordingly, none of the jury findings support NFL's assertion that its claim against the Vepuris arose by reason of false pretense, a false representation, or actual fraud; nor by a willful and malicious injury caused by the Vepuris to NFL or its property.  Therefore, as NFL did not sustain its burden of proof by a preponderance of the evidence, its $2 million claim will not be deemed nondischargeable.

Further, given the stipulation of the parties at trial, any judicial lien held by NFL is avoided under 11 U.S.C. § 522(f).

An order consistent with this memorandum will be entered.

_____
BRUCE FOX
United States Bankruptcy Judge

Dated: March 25, 2009

# CERTIFICATE OF NOTICE

District/off: 0313-2          User: Amelia          Page 1 of 1          Date Rcvd: Mar 25, 2009
Case: 08-00156               Form ID: pdf900        Total Served: 5

The following entities were served by first class mail on Mar 27, 2009.
ust          +Frederic J. Baker,   Office of the U.S. Trustee,   833 Chestnut Street,   Suite 500,
              Philadelphia, PA 19107-4405
ust          +United States Trustee,   Office of the U.S. Trustee,   833 Chestnut Street,   Suite 500,
              Philadelphia, PA 19107-4405
dft          +Murty S. Vepuri,   1707 Scott Drive,   Newtown, PA 18940-2900
pla           National Fertilizers, LTD,   SCOPE Complex Core III,   7 Institutional Area,   Lodi Road,
              New Delhi,   110 003,   INDIA
dft          +Varalaxmi Vepuri,   1707 Scott Drive,   Newtown, PA 18940-2900

The following entities were served by electronic transmission.
NONE.                                                                              TOTAL: 0

           ***** BYPASSED RECIPIENTS *****
NONE.                                                                              TOTAL: 0

Addresses marked '+' were corrected by inserting the ZIP or replacing an incorrect ZIP.
USPS regulations require that automation-compatible mail display the correct ZIP.

**I, Joseph Speetjens, declare under the penalty of perjury that I have served the attached document on the above listed entities in the manner shown, and prepared the Certificate of Notice and that it is true and correct to the best of my information and belief.**

**Meeting of Creditor Notices only (Official Form 9): Pursuant to Fed. R. Bank. P. 2002(a)(1), a notice containing the complete Social Security Number (SSN) of the debtor(s) was furnished to all parties listed.  This official court copy contains the redacted SSN as required by the bankruptcy rules and the Judiciary's privacy policies.**

**Date: Mar 27, 2009**                    **Signature:**          _Joseph Speetjens_